THE SUPREME LODGE ORDER OF MUTUAL PROTECTION

*v.*

FREDERICKA GELBKE.

*Opinion filed October 25, 1902.*

BENEFIT SOCIETIES—*effect of suicide by insured "whether sane or insane."* If the agreement between a benefit society and a member is that the company shall not be liable on the benefit certificate if his death shall result from his own suicidal act, whether sane or insane, the society is not liable where the insured voluntarily takes poison with the purpose of ending his life and with the knowledge that such will be the effect; and it makes no difference that he is moved thereto by an insane impulse or that he is incapable of forming a "rational intent."

*Supreme Lodge* v. *Gelbke*, 100 Ill. App. 190, reversed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

CRATTY BROS., JARVIS & LATIMER, for appellant.

E. F. HERRMANN, J. KENT GREEN, and E. M. WINSTON, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The Branch Appellate Court for the First District affirmed a judgment for $2165 recovered by appellee in the superior court of Cook county against appellant upon a membership certificate issued to Louis Gelbke, for the payment of the amount of one assessment, not exceeding $2000, to his wife, the appellee, after his death, upon the condition that he had complied with the charter, constitution, laws and rules of the order, and with the stipulation that the rights of the beneficiary should be determined by the charter, constitution, laws, rules and regulations of the order in force at the time the sum due should be payable.

The briefs and arguments on both sides, although entitled in this court, bear internal evidence of being addressed almost wholly to the Appellate Court, and are devoted largely to controverted questions of fact, even including the question whether the damages awarded were excessive. We shall, of course, not attempt to examine controverted questions of fact, and we do not deem it necessary to consider some of the legal questions argued by counsel, for the reason that they have little, if any, materiality under the evidence contained in the record.

The defense was, that the death of Louis Gelbke was caused by his own suicidal act, and that defendant was thereby exempted from liability by virtue of its contract with him. When the certificate was issued there was no provision in the charter, constitution, laws or rules of defendant against death from suicide. By-laws were subsequently adopted providing that there should be no liability upon the death of a member if such death was due to his suicidal act, whether at the time he was sane or insane, but in such a case there should be refunded to the beneficiary a sum equal to the assessments paid, with interest at four per cent. These by-laws were offered in evidence by the defendant, and objected to by plaintiff because they were adopted at meetings of the supreme lodge held in other States than Missouri, by which State the defendant was incorporated, and the objection was sustained. It was proved, however, that Gelbke was suspended for a failure to pay assessments, and was reinstated on his written application dated September 27, 1897, containing the following agreement on his part: "In consideration of my being re-instated as a member, I further agree to be bound by the laws of the order now in force or as they may be hereafter amended or enacted, and that should my disability or death be caused by or result, directly or indirectly, * * * by my own suicidal act, sane or insane, * * * neither myself nor any of my beneficiaries shall be entitled to participate in the

widows' and orphans' protection fund, * * * nor shall my beneficiary or beneficiaries have any claim * * * in case my death shall result from or depend upon any disease or injury which I may have had, acquire or receive prior to my being re-admitted as a member in your order, if re-admitted to beneficiary membership and my benefit certificate restored to me." There was no evidence of fraud or misrepresentation on the part of the defendant respecting the suspension or the re-instatement, and no evidence tending to show that Gelbke was not entirely capable of protecting his own interests and of entering into the agreement. He did not question the suspension or the validity of it, and was re-instated in consideration of his application and the representations therein contained. It was contended by the defendant that Gelbke was insane at the time of his death on May 24, 1898, but if he was insane at that time his mental derangement related solely to suspicions which he entertained concerning the fidelity of his wife. There was no evidence tending to show general incapacity to contract at the time of the re-instatement.

On May 30, 1898, plaintiff gave defendant notice of Gelbke's death and of her claim against the defendant, in which she stated the cause of death, as follows: "The cause of death was from poison taken while temporarily insane, as shown by the enclosed certificate of death issued by the board of health and by a certified copy of the coroner's inquest, hereto attached." The finding at the inquest, attached to the notice and referred to above, was that Gelbke "came to his death on the 24th day of May, 1898, from carbolic acid poison, said poison taken with suicidal intent while temporarily insane." The evidence for the defendant tended to prove that he took it intentionally, with full consciousness of the physical nature of the act and intending to take his life by that means. Plaintiff's claim was that Gelbke was insane, and that he did not intentionally take his own life.

The evidence tended to show that he had a violent and groundless jealousy of his wife, amounting to an insane delusion, and that his unfounded suspicion of her was the moving cause of his suicidal act.

The defendant asked the court to give the jury an instruction to the effect that although Gelbke, at the time of his death, was insane, yet if he was capable of forming an intention, and that he did intentionally commit suicide, the plaintiff could not collect more than the amount of the assessments, with four per cent interest thereon. The court changed the instruction, and gave it to the jury as follows:

"The court instructs you in this case, that though you may believe, from the evidence, that Louis Gelbke, at the time of his death, was insane, if you further believe, from the evidence, that, irrespective of such insanity, Louis Gelbke, at the time of his death, was capable of forming a rational intent and that he did with rational intent commit suicide, then the plaintiff in this case can not recover any greater sum than amount of assessments paid by Louis Gelbke during his lifetime, with four per cent interest thereon."

The material change in the instruction was by adding the qualification that the intent which Gelbke was capable of forming must be a rational one, and that he did with rational intent commit suicide.

The question of the proper interpretation of provisions in policies or certificates against self-destruction has been much discussed and has arisen in various forms. In the case of *Grand Lodge Independent Order of Mutual Aid* v. *Wieting*, 168 Ill. 408, there was a certificate containing the provision that the beneficiary should only be entitled to the amount paid in if the insured should "commit suicide." In construing that language we accepted and adopted the rule stated by the Supreme Court of the United States in *Life Ins. Co.* v. *Terry*, 15 Wall. 580, and approved by a majority of the State courts, as follows:

"If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of 'his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable." The agreement in this case is not the same as in that one, but provides for exemption from liability if the death of Gelbke should be caused by his own sui-cidal act, whether sane or insane, leaving nothing open, by its terms, except the question whether it was his act. The act of an insane man is not morally his act, so as to impose moral responsibility or render him amenable to the criminal law, because he is unable to understand his duties and obligations or to form a criminal intent, but the act would be his in fact if it was the result of his volition, although under a delusion. The suicidal act of an insane man is intentional if it is voluntary, with the purpose to take his own life, and with knowledge that such will be the effect of the act. The provision rendered the certificate void if Gelbke committed suicide, unless he was in such a state of mind as to be unconscious of the physical nature of the act which caused his death.   (19 Am. & Eng. Ency. of Law,—2d ed.—76.)

The Supreme Court of the United States had occasion, in the case of *Bigelow* v. *Berkshire Life Ins. Co.* 93 U. S. 224, to distinguish such an agreement as this one from a mere stipulation for exemption in the case of suicide. That was a suit on two policies on the life of Henry W. Bigelow, and there was an agreement that there should be no liability if he should die by suicide, sane or insane. The court held that the clause was entirely valid and exempted the insurer if the death was by the voluntary act of the insured, with consciousness of the physical

nature of the act, and he intended by such means to cause his death. The decision was that a person, although insane, might take his own life with a set purpose to accomplish that object, and if he did so, although insane, the insurer was not liable under the agreement in question. The same interpretation is maintained in *Home Benefit Ass.* v. *Sargent,* 142 U. S. 691.

The word "suicide," and the words "to die by his own hand," or "by his own act," or "to take his own life," mean the same thing, and each convey the idea of voluntary, intentional self-destruction. (*Grand Lodge* v. *Wieting, supra.*) Gelbke's agreement was, that if his death should result from his own suicidal act, whether sane or insane, the defendant should not be liable, and if he took the poison voluntarily, understanding the physical nature and consequences of his act, with a purpose and intention to cause his death, it makes no difference whether he was sane or insane or whether his intention was rational or irrational. To hold that he must have formed a rational intention is to make no distinction between an agreement for exemption in the case of committing suicide without any provision as to mental capacity, and one like this. The changes in the instruction required the formation of a rational intent, abrogating the agreement of the parties that the act should exempt the defendant although he might be insane. A rational intent is one founded on reason, as a faculty of the mind, and opposed to an irrational purpose. The instruction could only be understood by the jury as requiring an intent of a rational character, having its origin in a rational state of mind, as opposed to irrationality, insanity or disordered reason. The instruction as given was equivalent to informing the jury that self-destruction by Gelbke was not a defense unless his intention to commit the suicidal act was agreeable to reason, and rational rather than irrational. It practically destroyed the defense.

It is urged by counsel for appellee that the jury found that Gelbke was insane at the time of his death and that he did not intentionally take his own life; that this question of suicide was squarely put to the jury, and they found against suicide, and that, inasmuch as the plaintiff succeeded on that question, all other questions become immaterial. It does not appear from the record that the jury found the facts as asserted. Under this instruction the jury may have concluded that Gelbke formed an intent to take his own life and executed that intent, but that it was not a rational one. The modifications of the instruction constituted material error on the vital question of the case.

The judgments of the Appellate Court and the superior court of Cook county are reversed and the cause is remanded to the superior court.

*Reversed and remanded.*