MARY C. SHOEMAKER, Respondent, v. CENTRAL
BUSINESS MEN'S ASSOCIATION, a Corporation,
Appellant.

St. Louis Court of Appeals.    Opinion filed April 14, 1925.

1. INSURANCE: Accident Insurance: Policy: Construction: Illinois
Contract: Construed According to Laws of Illinois.  An Illinois ac-
cident insurance policy must be construed and the substantive
rights of the parties thereunder determined according to the law
of that State.

2. Same: Suicide: Insane: Insured Committing Suicide While Insane:
Insurer Not Liable.  Under an Illinois accident insurance policy,
containing a clause, "suicide, sane or insane, is not covered" no
recovery could be had where insured committed suicide, though, at
the time when he committed the act of self-destruction, his mental
functions were so disturbed or deranged by delirium that he was
unconscious of the physical nature and consequences of his act.

*Headnotes 1.  Insurance, 32 C. J., Section 7; 2. Accident Insurance,
1 C. J., Section 109.

*Reporter's Note*: *Certiorari* issued in the above cause by the Supreme
Court, on hearing, was quashed, December —, 1925.  See 278 S. W.
Rep. ———

Appeal from the Circuit Court of the City of St. Louis.
—*Hon. Wilson A. Taylor*, Judge.

REVERSED.

*Jones, Hocker, Sullivan & Angert.* for appellant.

(1)  It is not permissible for medical experts to
answer hypothetical questions which do not contain mate-
rial and necessary facts, or which contain immaterial
and unnecessary facts, when the expert has no personal
knowledge of the subject.  Seelig v. Missouri, Kansas &
Texas Ry. Co. (Mo.), 230 S. W. 92, 102; Marshall Livery
Co. v. McKelvey, 55 Mo. App. 240; Palmer v. Railroad,

142 Mo. App. 440; 1 Wigmore on Evidence, sec. 682; People v. Vanderhoff, 71 Mich. 176; Opp. v. Pryor, 294 Ill. 538. (2) It is improper for a medical expert to give his opinion and state conclusions as a fact in answer to a hypothetical question which contains merely hypothetical facts and not the element of personal knowledge by the expert and when the expert did not know and never saw the patient. Castanie v. Railroad, 249 Mo. 192, 155 S. W. 38; O'Leary v. Southern Steel Co., 260 S. W. 55; Kinchlow v. Railroad, 264 S. W. 416. (3) Expert testimony, when it degenerates into mere guess or conjecture, ceases to be admissible. 11 Ruling Case Law, sec. 35, p. 613, sec. 13, p. 582; Newmark v. Insurance Co., 30 Mo. 166. (4) Delirium is not presumed to continue. Richardson v. Smart, 65 Mo. App. 19. (5) Under an accident insurance policy which exempts the insurer from liability, if the insured comes to his death by "suicide, sane or insane," any physical act of the insured inflicted by himself which results in death, is covered by the exemption and the insurer is not liable, regardless of the mental condition of the insured at the time and regardless of whether he knew or appreciated the nature of the act or its consequences, and regardless of the nature or degree of his mental unsoundness or irresponsibility, and regardless of whether that mental condition was the result of sickness, delirium, intoxication, heredity, shock or injury. Under such a clause, where the insured dies by his own act, the insurer does not assume the risk of self-destruction. Grand Lodge v. Wieting, 168 Ill. 408; Supreme Lodge v. Gelbke, 198 Ill. 365; Dickerson v. Northwestern Mut. Life Ins. Co., 200 Ill. 270; Northwestern Mut. Ins. Co. v. Churchill, 105 Ill. App. 159; Supreme Lodge v. Zerulla, 98 Ill. App. 630 (first case); Supreme Lodge v. Zerulla, 118 Ill. App. 191 (second case); Seitzinger v. Modern Woodmen of America, 106 Ill. App. 449; Seitzinger v. Modern Woodmen of America, 204 Ill. 58; Supreme Counsel v. Pels, 110 Ill. App. 409; Supreme Court of Honor v. Buxton, 111 Ill. App. 187; Blasingame v. Royal Circle, 111 Ill. App. 202; Su-

preme Court Knights of Maccabees v. Marshal, 111 Ill. App. 312; Zerulla v. Supreme Lodge, 223 Ill. 518; Kiesewetter v. Supreme Tent of Knights of Maccabees, 227 Ill. 48; Haynie v. Knights Templar, 139 Mo. 416; Brower v. Supreme Lodge, 74 Mo. App. 494; United States F. & G. Co. v. Blum, 258 Fed. 897; Sovereign Camp v. Hunt, 98 So. 62; Scarth et al. v. Security Mut. Life Ins. Co., 75 Iowa, 346; Spruill v. Northwestern Mut. Life Ins. Co., 120 N. C. 141; Billings v. Accident Ins. Co. of N. Am., 64 Vt. 78; Jenkins v. Nat'l Union, 118 Ga. 587; Kunse v. Knights of the Modern Maccabees, 45 Ind. App. 30. (6) Authorities cited in connection with meaning of "delirium," "insanity" and "suicide." Owings Case, 1 Bland's Ch. 370 (Md.), 17 Am. Dec. 311; State v. Nowells, 135 Iowa, 53; 2 Century Dictionary, p. 1518; 3 Oxford Dictionary; Webster's International Dictionary; Clark's Heirs v. Ellis, 9 Or. 128, 132; 18 Corpus Juris, 475; Johnson v. Maine & N. B. Ins. Co., 83 Me. 182; Meyers v. Commonwealth, 3 Wkly. Notes Cas., 506, 508, 83 Pa. 131, 136; Cundall v. Haswell, 23 R. I. 508; Seitzinger v. Modern Woodmen of America, 204 Ill. 58; Spruill v. N. W. Mut. Life Ins. Co., 120 N. C. 141; State v. Leeman, 2 S. D. 171; Warner v. State, 114 Ind. 137; Gunter v. Note, 83 Ala. 96; Erwin v. State, 10 Tex. App. 700; American Board of Comr's, 102 Me. 72.

*J. D. Wilson* and *F. H. Bacon* for respondent.

(1) There was no error in the admission or exclusion of evidence. The hypothetical question asked Dr. Wolfort, the expert witness, was not objected to when the question was completed. (2) The exception in the policy sued on should be strictly construed. Mathews v. Modern Woodmen, 236 Mo. 326; McMaster v. New York Life Ins. Co., 183 U. S. 25; Turley v. North American Ins. Co., 25 Wend. 377. (3) Delirium and insanity, under the definitions of accepted standard authorities, are distinctive terms, and in no way synonymous. The words "suicide, sane or insane," are contradictory; they may

mean, if anything, that to constitute suicide, within the proviso, the insured must have had the intent to destroy himself, even though the intent was that of an insane person. A man delirious from the effects of drugs or illness to such an extent as to be unable to know what he is doing is not an insane person, nor can he commit suicide. 1. The finding of the jury was that at the time of his death Shoemaker was delirious and did not know what he was doing. The verdict is conclusive as to the facts. Consequently, in applying the law, we must assume that at the time of his death Shoemaker did not know what he was doing. 2. The words used in the policy are "suicide, sane or insane." Suicide is the act of voluntarily and intentionally destroying one's own life by a person of years of discretion and of sane mind. A death by accident, even though it be the result of one's own act, is not suicide. 37 Cyc. 518. To the same effect are other definitions: Bouvier's Law Dictionary—Suicide; Webster's Dictionary—Suicide; Standard Dictionary—Suicide; Century Dictionary—Suicide. The Standard Dictionary defines "delirium" as a morbid condition, often the result of fever, in which mental action is irrational and incoherent. The definition in the Century Dictionary is a disordered state, more or less temporary, of the mental faculties occuring during illness. To the same effect are other definitions: 18 Corp. Jr., p. 475. Other authorities distinguish between insanity and delirium: 14 Encyl. Brit., Insanity (11 Ed.); 2 Hamilton's Medical Jurisprudence. p. 52; Wharton & Stille, Medical Jurisprudence, (4 Ed.), sec. 240; Grand Lodge v. Mode, 247 S. W. 386; Supreme Lodge v. Lapp's Admx., 74 S. W. 656. 3. The Illinois cases are conflicting, and some express views in conflict with those found in Seitzinger v. Modern Woodmen, 204 Ill. 558, 68 N. E. 478, viz.: Supreme Lodge v. Gelbke, 198 Ill. 365; Dickerson v. Northwestern Mut. Life Ins. Co., 200 Ill. 270; Knights Templar, etc., Co. v. Crayton, 209 Ill. 550. 4. Many courts have held that death resulting from an act committed in delirium is not suicide. Blackstone v. Stand-

ard Life & Acc. Co., 74 Mich. 952; Cady v. Fidelity & Casualty Co., 134 Wis. 322. (see, also, explanatory note to this case, 17 L. R. A. [N. S.] 263); Dean v. American Mutual Life Ins. Co., 4 Allen 96; Parker v. New York Life Ins. Co., 125 S. E. Rep. 6; Bohaker v. Travelers Ins. Co., 215 Mass. 32, 46 L. R. A. (N. S.) 543. (4) There can be no suicide, sane or insane, unless there is an intent to take one's own life; otherwise it is an accidental death. Where death results from an unintentional act it is an accident. To commit suicide, sane or insane, there must be an intent, even though that of an insane person. Counsel ask to have this court hold that what was meant by the Supreme court of Illinois in the opinion in the Seitzinger case is that the definition of suicide must be changed so that if death results from a man's own act it is suicide. (5) It is impossible to fix the exact boundary line between sanity and insanity, or between suicide and accident. Each case must be decided on its own facts. The jury found from the evidence that Shoemaker, when he threw himself from the window, did not know what he was doing, consequently there was no intent to commit suicide, and his death was accidental. (6) In determining the value to be given to legal precedents, the facts in each case must be considered. A slavish regard for so-called precedents leads to confusion and uncertainty unless this is done. The facts in the case under consideration differ from those in the cases claimed by counsel for appellant to govern in this case.

SUTTON, C.—This is an action upon an accident insurance policy. The cause was tried to a jury. There was a verdict for the plaintiff for the full amount of the policy and interest, and judgment was given accordingly. The defendant appeals.

The policy sued on insures Dr. Samuel E. Shoemaker "against loss resulting from bodily injuries effected directly or independently of all other causes, through accidental means (suicide, sane or insane, is not covered), as specified in the following schedule: . . . For loss

of life, $5,000.'' The plaintiff is the beneficiary named in the policy. The insured died on the 11th day of October, 1919, as a result of self-inflicted injuries. Plaintiff notified defendant of said death and made proof thereof in May, 1921, and this suit was brought June 28, 1921.

It is alleged in the petition that the insured ''lost his life from the result of bodily injuries effected independent and exclusive of all other causes through accidental means, to-wit, on that day said Samuel E. Shoemaker, while a patient at St. John's Hospital in the city of Springfield, Illinois, and while delirious from the effects of drugs administered to him by the physicians in charge of said hospital to relieve his pain and suffering, and while delirious from the effect of said drugs and illness, unable to understand or comprehend the nature or consequences of this act, wounded himself in the throat with, to-wit, a pocketknife, and threw himself from the window of said hospital, striking with violence on the granitoid pavement, which said injuries so received resulted in death.''

The insured's death occurred at St. John's Hospital, at Springfield, Illinois. He was taken to the hospital for treatment on October 5, 1919. He was afflicted with a rectal abscess, a very painful disease, for which he had been taking morphine. It appears that from the time he entered the hospital he suffered continuous pain. His pain was so severe that he had to be given morphine, and suppositories containing opium were also used. He suffered continuously from the time he entered the hospital until the time of his death, except as he was relieved by administering morphine. He was in the hospital six days. During that time his temperature ranged from 98.6 to 102.8, his pulse from 96 to 120, and his respiration from 20 to 32, as shown by the hospital record kept by the nurse in attendance. There was no delirium noted in this record, and Sister Regis, the nurse in charge, testified that the insured did not exhibit delirium

or any abnormal mental condition at any time while in the hospital that she observed prior to the injuries which caused his death, and the attending physician and friends who visited him testified to the same effect.

There was evidence tending to show that the insured was of a genial, happy disposition, that he had a likeable personality, made friends easily, was good-natured and popular, and that he was a successful dentist. On the other hand there was evidence tending to show that he was a periodical drinker; that he indulged in periodical sprees lasting for a week at a time; that the habit grew worse as time passed; that just before he was taken to the hospital he indulged in an unusually heavy spree; that he was involved in an unfortunate affair of such a serious nature as would ordinarily give rise to despondency and worry.

The evidence for the plaintiff shows that the insured, while in the hospital occupied room 110 on an upper floor; that about four o'clock in the afternoon of the sixth day of his confinement in the hospital he wounded himself in the throat three times with his pocketknife and threw himself from the window of his room to the pavement below, and died from the injuries thus inflicted.

Sister Regis, produced as a witness by plaintiff, testified:

"Dr. Shoemaker wounded himself with a knife. He wounded himself three times in the neck, and the knife, it had a file blade on it, and there was an extra blade on the end of it. I guess they call it a penknife. I cannot say which blade of the knife he used in inflicting the wounds. I had a conversation with him before he cut his throat. I went to ask him whether he wanted a little lunch and he said 'No,' and I said he had better take a glass of milk, and he said 'All right Sister.' I got a glass of milk and offered it to him. Then he asked me to write a telegram for him. I asked to whom and he said to his sister in New York. Then he told me he had better write the telegram himself. I got him a piece

of paper and he wrote the telegram. Then he took his treatment and asked me to close the door and said that he would call if he wanted anything, that he wanted to take a little sleep. It was rather noisy in the hall and as I went out of the door he said a second time 'Please close the door, I would like to take a little nap as it is rather noisy in the hall.'. I closed the door and took the telegram to the office. The next thing I knew it was four o'clock when they said he was not in his room and the first time I saw him then he was lying down below the window of his room on the granitoid sidewalk. I had frequent conversations with Dr. Shoemaker while attending him and talked with him on every occasional visit to his room. The last conversation I had with him was the one just mentioned somewhere around two o'clock. I did not notice anything unusual or abnormal about him at all. As far as I could see he was normal in every respect. According to the records the last drug of any description that was given to him was at three o'clock that morning.''

The testimony of Cole Walker, who was confined in the hospital with a fractured leg at the time the insured injured himself, was introduced by plaintiff, and from it we excerpt the following:

''About four p. m. I was sitting up in my bed and I could see the back part of room 110, as that room is not so long as my room. I saw a man hurriedly raise the window and climb up on the window sill, then he just bent over and bowed his head and dove off, just like diving in water. The last I saw was his feet up in the air. I could not get up, so that was the last I saw.''

The affidavit of plaintiff was introduced in evidence by her. This affidavit was addressed to the defendant, dated May 4, 1921, and contained the following statement concerning the death of the insured:

''He was a patient at St. John's Hospital, Springfield, Illinois, for the purpose of a surgical operation, and, while delirious from illness and laboring under delusion which made him unable to understand what he

was doing, threw himself from an upper window and came to his death because of the fall.''

In the proofs of death introduced by plaintiff, she made the following statement concerning the manner of the insured's death:

''He cut his throat and jumped from a window while delirious from fever and pain.''

Dr. Louis J. Wolfort, introduced by plaintiff, in answer to a hypothetical question propounded by plaintiff's counsel concerning the insured's mental condition at the time he cut his throat and jumped out of the window, said that in his opinion ''when the patient attacked himself with his pocketknife and jumped out of the window, he was in a delirious state of mind and did not know what he was doing.'' Dr. Wolfort had never seen the insured, and based his opinion entirely upon hypothetical facts set forth in the question. On cross-examination he said: ''I believe that this man, in an acute delirium, took his life; that is my belief.'' The witness attributed the insured's delirium to poison absorbed in the system from the rectal abscess.

Dr. J. G. Meyer, who was in charge of the insured at the hospital, testifying on behalf of the defendant, said:

''I saw Dr. Shoemaker several times each day while he was in the hospital, and on every occasion found him perfectly rational. I saw him about nine o'clock in the morning on the day he killed himself and again between 1:30 and 2 o'clock p. m., and on these occasions he talked rational, as he always did. I next saw him about three or four o'clock in the afternoon. The sisters called me up and said he had injured himself. I went to the operating room and they had him on the table when I got there. He had severed the jugular vein, and he had cut open his neck, and undoubtedly he fractured his skull or injured himself severely at the time. He was unconscious and was very near death because of the loss of blood and the shock. There was nothing in his condition

at any time prior to his injury to indicate in any way that he was irrational or in delirium.''

The policy in suit is an Illinois contract, and it must be construed and the substantive rights of the parties thereunder determined according to the law of that State. The controversy in the case concerns the proper construction to be given to the following clause of the policy: ''Suicide, sane or insane, is not covered.''

The plaintiff contends that the words, ''suicide, sane or insane,'' are contradictory and meaningless; that every definition of suicide makes the intent of taking one's own life the indispensable element which constitutes the act; that under the definition of suicide only a sane man can commit suicide; that an insane man cannot commit suicide; that the only reasonable meaning to be given to the words as used in the policy is that in case of either an insane man or a sane man, whose death is caused by his own act, there must be some suicidal intent, even if the intent be only the bewildered and uncertain intent of an insane man; and that if the insured in this case was in such a condition of mind at the time he cut his throat and threw himself from the window of the hospital that he did not know what he was doing and was incapable of understanding the physical nature and effect of his acts, then his death was not the result of suicide, and the defendant is liable under the policy for such death.

The contention of the defendant is that if the insured killed himself, then it matters not that he was at the time delirious, that he was either sane or insane, or what was his mental condition, or how sound or unsound or disordered was his mind, the clause of the policy in question, nevertheless, in either event, exempts the defendant from liability, and the plaintiff cannot recover.

In Seitzinger v. Modern Woodmen of America, 106 Ill. App. 449, the insurance contract sued on provided that it should become null and void if the insured should within three years, ''die by his own hand whether sane or insane.'' The defendant in his answer set up this clause

of the policy in defense of the action. The plaintiff replied that at the time the insured came to his death by his own hand, he was "wholly insane, totally unconscious of the manner of his death, and wholly and totally incapable, by reason of such insanity, of forming an intention to take his own life, and did not, at the time, comprehend or understand the physical nature and result of his act, and did not intend to take his life." The defendant demurred to this replication, the trial court sustained the demurrer, dismissed the suit, and rendered judgment in favor of the defendant. In disposing of the case on appeal the appellate court said:

"It is known by all who have given the subject any attention that self-destruction by assured persons has become very frequent, and that in almost all such cases it is sought to avoid the effect of provisions in the contract relieving the insurer from liability in such cases, by setting up the insanity of the assured at the time of committing the prohibited act. And, 'as the line between sanity and insanity is often shadowy and difficult to define,' and the line between one degree of insanity and another is still more so, experience demonstrated that any clause in such contract dependent upon the mental condition of the assured at the time of the act was practically of no avail; and, having both a lawful and moral right to do so, and prudence on their part and justice to their surviving policy-holders and members demanding it, insurance companies and fraternal and beneficial societies generally, have deemed it their duty to so provide in their contracts as to take the whole question as to sanity or insanity out of the domain of controversy. To this end such provisions as the one in the case at bar have been made part of the contract. These provisions are of comparatively recent date, and cases containing them form a distinctively separate class. The language is, shall 'die by his own hand, sane or insane,' or other form clearly indicating a purpose to exclude all question as to mental condition. Where there is such a stipulation in the contract, the modern authorities are almost

uniformly to the effect that it is valid and that there can be no recovery, even if the assured was 'utterly bereft of reason' at the time of committing the act. In such case 'it is wholly immaterial what the assured's mental condition was.' . . .

"The contract in the case at bar contains the provision that if the assured 'shall within three years die by his own hand, whether sane or insane,' his insurance shall be forfeited, his 'certificate shall become null and void.' Within nine months he was dead; had died by his own hand. True, he was insane; but the clause in his contract includes that condition. True, he was insane to an extreme degree, but the language in his contract, when given no more than its plain and ordinary meaning, includes all degrees of insanity. He was insane. The parties to this contract undertook and intended to exclude all liability in case of self-destruction, and to exclude and put all question as to sanity or insanity out of the domain of controversy, and to that end chose apt and comprehensive words that had a plain, precise and definite meaning."

The Seitzinger case went on appeal to the Supreme Court. [Seitzinger v. Modern Woodmen of America, 204 Ill. 58.] In disposing of the case the Supreme Court, speaking through Justice WILKIN, said:

"There seems to be a general concensus of opinion in the several courts of last resort in this country in which the question has arisen, that where a policy contains the condition that if the insured dies by his own hand, commits suicide, self-destruction, etc., 'whether sane or insane,' and he does die by his own act, the insurer is not liable; that 'the word "insane" implies every degree of unsoundness of mind, and the liability of the insurer is not affected by the degree of insanity.' The case of De-Gogorza v. Insurance Co., 65 N. Y. 235, is generally cited as the leading case on the subject. Speaking of the condition 'sane or insane,' it is there said: 'We have therefore only to consider the interpretation to be given to the language of the contract of insurance, for no ques-

tion is made but that it was fully understood and agreed to by both parties. It can scarcely be doubted that an insurer of the life of a person may, by apt language, guard himself from liability for all disasters if the exemption does not contravene public policy. He may provide that if the assured shall die of the small-pox or any other specified disease of the body, he would not be liable, and there appears to be no reason why he may not guard himself against liability if death results from any disease of the mind. Indeed, it is said by LAPALLO, J., in Van-Zant v. Insurance Co., 55 N. Y. 160, "that no rational doubt can be entertained that a condition exempting the insurer from liability in case of the death of the assured by his own hand, whether sane or insane, would be valid if mutually agreed upon between the insurer and the insured:" and then, in substance, adds that if nothing is said with respect to insanity, the result is that a party does not "die by his own hand" if his death happens from the involuntary act of a madman. This view of the question is but a very concise and accurate statement of the law as announced in cases previously adjudged. . . . The word "insane" or "insanity" ordinarily implies every degree of the unsoundness of mind; and in this case we assume that the assured was in the very last degree mad or insane, so that the mere act of self-destruction was wholly involuntary. . . . We prefer to base our decision upon the ground that the words of the proviso in the policy before us, by plain rules of interpretation, exempt the insurer from liability.' . . .

"In the recent case of Clark v. Equitable Life Assurance Society, 118 Fed. Rep. 374, the Circuit Court of Appeals for the Fourth District construed the condition, and held that in that case the provision 'self-destruction, sane or insane,' was a risk not assumed by the society in the contract. In that case the evidence showed the insured shot himself in the head with a pistol. Plaintiffs, in their replication admitting the shooting, averred that the mind of the assured 'was so impaired and affected by insanity that he was not conscious of the physical nature

and consequences of the act he then committed and did not intend to cause his death, but was moved to commit said act by irresistible impulse.' The lower court sustained a demurrer to the replication and the circuit court of appeals affirmed the judgment. In its opinion by BRAWLEY, district judge, the following cogent reasoning is used: 'If it was an open question, there is much to be said of the injustice of contracts of this nature, for a person ought no more to be held responsible for the loss of his life when taken by himself under the ravings of delirium or impelled by the hallucinations of melancholy than if he dies from ordinary disease or from an accident. But that question is not before us, and it seems to be well settled that insurance companies may avoid altogether this class of risks, and that, being at liberty to stipulate against hazardous occupations, unhealthy climates or deaths from consumption or other excepted diseases, they may also contract not to assume a risk of a certain mode of death, and presumably the premiums are calculated on the elimination of that risk. If the assured is informed, in apt words, of the extent of the limitation, it is not perceived that there is any good reason why such contract should not be governed by the same rules of interpretation as control courts in all other cases of contract, and why plain and unambiguous words should be frittered away by casuistry and refinement. . . . It will be observed that the proviso under consideration contains no words limiting its operation to intentional suicide. The company contracted that it would not assume the risk of self-destruction, sane or insane. The contention of appellant is, that self-destruction avoids the policy if the insured lacked the intelligence to know that his act was wrong, but that it is not avoided if he did not understand the physical nature of his act. To sustain such a contention would require us to believe that the deceased shot himself through the head because he did not know that it would kill him. Instead of giving to the words of the proviso the plain meaning for which they were manifestly intended—that the in-

surer intended to guard itself from liability if the insured came to his death from any physical movement of his own, whether sane or insane—we would lose ourselves in the consideration of the different phases of insanity, be compelled to split it into degrees, and to hold that if he was so entirely insane as not to understand the physical consequences of his act the proviso would be avoided, while a lesser degree of insanity would make the company liable.'

"In the case at bar the replication confesses. the cause of death and seeks to avoid the condition in the contract by setting up the insanity of the insured. It is not denied that an insurance company may contract to avoid liability if death results from any disease of the mind, just as it may if death results from any specified bodily disease, if the contract is embodied in apt language. Nothing can be clearer than that the words 'sane or insane' were introduced in the certificate by the insurer for the purpose of excepting from its operation any self-destruction, whether the insured was of sound mind or in a state of insanity. There is no qualification of the varying degrees of insanity, but the language is, simply, 'sane or insane.' These words have a precise, definite, well understood meaning. No reasonable mind could be misled by them, and no expansion of language could more clearly express the intention of the parties. In the construction of ordinary words in a contract they are to be given the meaning which they convey to the ordinary mind, and to permit, in cases of this kind, the discussion and proof and a differentiation of the degrees of insanity would be to do violence to words having a generally accepted significance and to do that which the parties themselves never contemplated. By the plain rules of interpretation appellee is exempt from liability under this contract."

Supreme Council of the Royal Arcanum v. Pels, 110 Ill. App. 409, was an action on a benefit certificate issued by a fraternal beneficiary society. In that case the court said:

''Under a by-law providing that the certificate should be void in case the member committed suicide, appellant would be liable only 'if at the time of the suicidal act the assured was so affected with insanity as to be unconscious of the act or of the physical effect thereof, or was driven to its commission by an insane impulse which he has not the power to resist.' [Grand Lodge v. Wieting, 168 Ill. 408.] Under a by-law providing that the certificate should be void if the insured 'whether sane or insane, die by his own hand,' any self-destruction is excepted, and there is complete exemption from liability in case of suicide by the insured, notwithstanding he was wholly insane and incapable of understanding the physical nature and effect of his act. [Seitzinger v. Modern Woodmen, 204 Ill. 58.] ''

Supreme Court of Honor v. Buxton, 111 Ill. App. 187, was an action on a benefit certificate of a fraternal beneficiary society. The certificate contained a clause exempting the society from liability if the insured should ''commit suicide whether sane or insane.'' In disposing of that case the court said:

''Since the opinion of the Supreme Court in Seitzinger v. Modern Woodmen, 204 Ill. 58, the effect of a provision in a policy of insurance exempting the insurer from liability if the insured 'commits suicide whether sane or insane,' is no longer an open question in this State. That case determines the right of the contracting parties to limit the liability of the insurer by such a provision; that it must be given the construction which the words employed naturally and ordinarily import and is not to be qualified so as to create a liability on the part of the insurer, even if the insured at the time he committed suicide, was of such unsound mind as to be wholly ignorant and unconscious of the physical nature of such act of self-destruction.''

In Blasingame v. The Royal Circle, 111 Ill. App. 202, which was also an action on a benefit certificate of a fraternal beneficiary society, the answer pleaded a provision in the insured's application for membership that

if the insured should "die by suicide whether sane or insane," the defendant should not be liable. The cause was determined upon a demurrer to the plaintiff's replication to defendant's answer. In disposing of that case the court said:

"The stipulation alleged to be contained in the application, providing that if the insured should die by suicide whether sane or insane, the society should not be responsible, if properly pleaded, constitutes a complete exemption from liability in case of suicide by the insured, notwithstanding he was wholly insane and totally incapable of understanding the physical nature and effect of his act. [Seitzinger v. Modern Woodmen, 204 Ill. 58.]"

In Supreme Court Knights of the Maccabees of the World v. Marshall, 111 Ill. App. 312, the defendant pleaded that the insured committed suicide in violation of a provision of the insurance contract sued on exempting the defendant from liability in the event of the death of the insured "by suicide whether sane or insane." The plaintiff replied that the insured was at the time he committed the act which caused his death "so mentally unsound as to not comprehend the nature of the act of self-destruction, and was incapable of forming an intent to take his own life." The defendant demurred to this replication and the trial court overruled the demurrer. The appellate court, holding that this was error, said:

"A provision of a life insurance policy which provides against liability if the insured shall commit suicide whether sane or insane, is a complete exemption from liability in case of suicide by the insured, notwithstanding he was wholly insane and totally incapable of understanding the physical nature and effect of his act of self-destruction. [Seitzinger v. The Modern Woodmen of America, 204 Ill. 58.]"

In Zerulla v. Supreme Lodge Order of Mutual Protection, 118 Ill. App. 191, a clause in the insurance contract sued on exempted the defendant from any liability

in case the death of the insured should be caused by his own "suicidal act, sane or insane," and in disposing of that case the court said:

"The contention of appellant is, that if Jordan (the insured) at the time he took his own life was by reason of his insanity 'unconscious of the act, or the physical effect thereof, or was driven to the commission of the deed by an insane impulse which he had not the power to resist, appellant was entitled to recover.'

"The case of Seitzinger v. The Modern Woodmen, 204 Ill. 58, is conclusive against this contention. It was in that case decided that a clause in a life policy providing against liability if the insured 'shall die by his own hand whether sane or insane' is a complete exemption from liability in case of suicide by the insured, notwithstanding he was wholly insane and totally incapable of understanding the physical nature and effect of his act."

The Zerulla case went to the Supreme Court upon appeal. Zerulla v. Supreme Lodge Order of Mutual Protection, 223 Ill. 518. And the Supreme Court, affirming the judgment of the appellate court, said:

"The Appellate Court in which the judgment sought to be reversed was rendered, held, under the authority of Seitzinger v. Modern Woodmen of America, 204 Ill. 58, that the fact that Jordan committed suicide precluded a recovery, and based its judgment of affirmance of the judgment of the circuit court upon that ground. . . . It is not denied Jordan committed suicide, and we adhere to the rule announced in Seitzinger v. Modern Woodmen of America, supra, that under the provisions of his contract there can be no recovery in this case whether he was sane or insane—and this without regard to the degree of his insanity, if he was insane at the time."

In Kiesewetter v. Knights of Maccabees, 227 Ill. 48, the insurance contract provided that the defendant should not be liable in case of "the suicide of the insured whether sane or insane." The evidence showed that the insured committed suicide by hanging. The defendant demurred

to the evidence in the trial court. The demurrer was sustained and judgment given accordingly. The Supreme Court, affirming the judgment of the trial court, said:

"Counsel stated to the court that he offered to prove . . . 'that the deceased came to his death while insane; that his mind was in such a condition of insanity and frenzy that he was not aware, at the time of his death, of the physical consequences of his act if he took his life at that time.' The offer was objected to and the court properly sustained the objection. [Seitzinger v. Modern Woodmen, 204 Ill. 58; Zerulla v. Supreme Lodge, 223 id. 518.]"

We see no escape for plaintiff from the binding effect of the Illinois decisions, for they unquestionably hold that, where the physical movement or act of the insured resulting in his death necessarily imports suicidal intent, this is suicide within the meaning of the words, "suicide, sane or insane," regardless of the mental condition of the insured at the time of the commission of the suicidal act.

The plaintiff's counsel contend, however, that the Illinois cases are conflicting. They say that Supreme Lodge v. Gelbke, 198 Ill. 365; Dickerson v. Northwestern Mutual Life Ins. Co., 200 Ill. 270; Royal Circle v. Achterrath, 204 Ill. 549, and Knight Templars v. Crayton, 209 Ill. 550, announce a contrary doctrine to that announced in the Seitzinger case and the cases following it.

The Supreme Court in the Seitzinzer case, reviewing the Gelbke case, said:

"It was not decided in that case that under the contract of insurance there declared upon the insurer might not insist upon its non-liability upon proof that the insured came to his death by suicide, even though the degree of insanity was such that he was 'wholly insane, totally unconscious of the manner of his death, and wholly and totally incapable, by reason of such insanity, of forming an intention of taking his own life, and did not at the time comprehend or understand the physical

nature and result of his act and did not intend to take his life,' as was attempted to be urged by the plaintiff in this case under the replication.''

In the Dickerson case there was no issue made as to the mental condition of the insured, and the pronouncement of the court in that case to the effect that the de· fendant was not relieved from liability under the exemption clause of the policy, unless the insured was in such a state of mind as to be unconscious of the physical nature and effect of the act of self-destruction, was not germane to any question before the court for decision. The same is true of the Achterrath case. Moreover, the dicta of the court in these cases must be regarded as overruled by the later decisions of the same court.          .

There is nothing in the Crayton case at war with what was said in the Seitzinger case. It but announces a familiar doctrine recognized in all the decisions, that where the insured kills himself by accidental physical acts or movements, the provision of the policy with reference to self-destruction, sane or insane, does not apply. Besides this, the doctrine of the Seitzinger case has been twice reaffirmed by the Supreme Court since the Crayton case was decided.

There is nothing in the record in the present case tending in the slightest degree to show that the insured killed himself accidentally. His physical movements, as shown by the undisputed evidence, are not susceptible of any such interpretation. He cut his throat three times with his pocketknife, laying the throat open and severing the jugular vein. He then raised the window of his room, climbed upon the window sill, bent over, bowed his head, and threw himself head foremost to the granitoid pavement below. From these physical movements an intent to commit self-destruction is as manifest as if he had hanged himself, or shot himself, or taken a deadly poison. There is no hint or suggestion in the evidence that he came to his death by accidentally cutting his throat, or accidentally falling from the window, or by the

accidental or intentional act or acts of any other person. Besides, the plaintiff does not predicate her alleged right of recovery upon the death of the insured by any such accidental movements or acts. She did not so plead her case, nor did she try it on that theory below. She alleges in her petition that the insured, "while delirious from the effect of drugs and illness and unable to understand or comprehend the nature or consequences of his act, wounded himself in the throat with a pocketknife and threw himself from the window of the hospital, striking with violence on the granitoid pavement, which said injuries so received resulted in death." The petition clearly declares upon accidental death in the sense that the insured took his own life when he was in such a condition of mind as to be incapable of understanding or comprehending the nature or consequences of the act of self-destruction.

But it is urged by plaintiff's counsel that the insured in this case, when he committed the act or acts which caused his death, was neither sane nor insane, but was in a state of delirium, which so disturbed or deranged his mental functions that he did not know what he was doing and was unconscious of the physical nature and consequences of his acts, and that therefore his self-destruction was not "suicide, sane or insane," within the meaning of those words as used in the exemption clause of the policy. Counsel on both sides of this case have brought to our attention many definitions of "delirium" and "insanity," as formulated by eminent authorities. It would serve no useful purpose to enter into a discussion of the abstruse learning involved in these definitions. After having read them all, we have not the slightest hesitancy to say that a person whose mental functions are so disturbed or deranged by delirium that he is unconscious of the physical nature and consequences of the act of self-destruction, is, in contemplation of law, insane.

We find no recognition in the books of any state or condition of mind which is neither sane nor insane. If

the insured, when he killed himself, was not "insane," then he was "sane." The one term is but the antipode of the other. Whatever phase of mental condition is not included in the one term is included in the other. There can be no sort of doubt that the expression, "sane or insane," as used in the exemption clause of this policy, includes the entire range of mental condition. The law of Illinois is so written, and we are bound by it.

The Commissioner recommends that the judgment of the circuit court be reversed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly reversed.

*Daues, P. J.,* and *Becker* and *Nipper, JJ.,* concur.